

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Paul Riley*
*Assistant United States Attorney*
*Paul.Riley @usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4959*
*MAIN: 410-209-4800*
*FAX: 410-962-3091*

**VIA ECF**

April 17, 2025

The Honorable Stephanie A. Gallagher
United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:     *United States v. Valerie Joseph*, Criminal No. SAG-23-219

Dear Judge Gallagher:

The Government writes this letter in advance of the sentencing of Defendant Valerie Joseph, which is currently scheduled for April 24, 2025, at 2:00 P.M. to respond briefly to certain arguments in Defendant's "Submission on Guideline Disputes" (Guideline Submission) and her "Memorandum in Aid of Sentencing" (Sentencing Mem.) (ECF No. 69).

**Defendant Caused Substantial Financial Hardship To Victim K.F.**

Defendant takes issue with two aspects of the Government's understanding of the applicable sentencing guidelines in this case. First, she contends that her offense did not cause substantial financial hardship to one or more victims under U.S.S.G. § 2B1.1(b)(2)(A)(iii) and that there thus should not be a two-level enhancement under this provision. Second, she argues that she is entitled to a two-level reduction under U.S.S.G. § 4C1.1. Both arguments fail.

**A.  A Two-Level Enhancement Is Warranted Under § 2B1.1(b)(2)(A)(iii)**

As an initial matter, there is no question that a two-level guideline enhancement under § 2B1.1(b)(2)(A)(iii) applies here. That provision applies "if the offense . . . resulted in substantial financial hardship to one or more victims." *Id.*

Application Note F to this provision provides a non-exhaustive list of factors for courts to consider in determining whether the offense caused substantial financial hardship to a victim, including: "suffering substantial loss of a retirement, education, or other savings or investment fund" and "making substantial changes to his or her employment, such as postponing his or her retirement plans."

Here, K.F.'s victim impact statement directly implicates these two factors. Regarding substantial loss of savings or investment funds, K.F. notes that Defendant's theft "destroyed [his] personal finances," forced him to put his home up as collateral to help keep his business operating, required him to sell off his stock and bond portfolio, and ultimately impacted the amount he could provide to his father to pay for his father's healthcare. Ex. ECF No. 65-4 (VIS).

Regarding changes to employment, "such as postponing his or retirement plans," K.F. notes that, "I couldn't invest in growing the business or securing my own retirement. I was forced to work longer hours, well beyond what I should have been doing at this stage in my life.

Retirement, something I had planned for and worked toward, has been pushed back indefinitely." *Id.* at 2.

A "substantial financial hardship is 'a loss' that 'significantly impacts the victim's resources.'" *United States v. Aderinoye*, 33 F.4th 751, 757 (5th Cir. 2022) (enhancement properly applied where victim impact statement established that small business suffered approximate $100,000 loss, which was not "ruinous" but also not "minor or inconsequential"); *see also United States v. Amin*, 839 F. App'x 810, 812 (4th Cir. 2021) ("The district court properly found that the owners of the business suffered severe financial hardship through a substantial loss of their savings that they invested into their company and substantial changes to their employment following the failure of their business venture."); *United States v. Skouteris*, 51 F.4th 658, 672 (6th Cir. 2022) (enhancement "requires a showing that the loss was 'more than minimal or trivial' as gauged by the victim's specific financial circumstances").

Indeed, courts that have considered the issue have determined that whether a victim has suffered substantial financial harm is not a fixed determination, but rather is relative to that victim's financial situation.  *See United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020) ("We conclude that section 2B1.1(b)(2) requires the sentencing court to determine whether the victims suffered loss that was significant in light of their individual financial circumstances"); *United States v. Reid*, 742 F. App'x 707, 709 (3d Cir. 2018) ("'Substantial financial hardship' exists on a sliding scale and must be interpreted subjectively for each victim, not according to some fixed amount" (citing *United States v. Poulson*, 871 F.3d 261, 268 (3d Cir. 2017)); *United States v. Minhas*, 850 F.3d 873, 877 (7th Cir. 2017) ("[W]hether a loss has resulted in a substantial hardship . . . will, in most cases, be gauged relative to each victim," and "the same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup."); *United States v. Castenada-Pozo*, 877 F.3d 1249, 1252 (11th Cir. 2017) (nothing that "the inquiry is specific to each victim" and finding that "[a]lthough each victim's pecuniary loss may not seem great, Castaneda-Pozo's actions made his victim in secure in life's basis necessities--housing, electricity, water, and food" and therefore they suffered substantial financial hardship); *United States v. Brandriet*, 840 F.3d 558, 561 (8th Cir. 2016) (finding that the court did not clearly error "when it found that a victim who lost savings, postponed her retirement, and was forced to move suffered substantial financial hardship).

Indeed, as noted by the Third Circuit, determining substantial financial hardship is measured "on a sliding scale that is also fairly subjective." *United States v. Poulson*, 871 F.3d 261, 268 (3d Cir. 2017).

> [B]etween a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to charity), and a devastating loss (occurring in the wake of a scheme to wipe out of a victim's life savings), there lies a wide range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4[ (F)]. In the end, this is just one more determination of a fact that bears on the ultimate sentence; that determination is entitled to the normal deference that applies to all facts found at sentencing.

*Id.* (quoting *United States v. Minhas*, 850 F.3d 873, 878 (7th Cir. 2017)).

Here, based on K.F.'s financial situation, there is no question that he suffered just such a financial hardship here.[1] His victim impact statement makes that plain.

Defendant appears to suggest that her theft of $1.4 million dollars over 10 years, when broken down by year, "is a relatively small number." Guideline Submission at 3. But this contention ignores the fact that Victim Business 1 is a small, family-owned business, and not a major corporation. And it ignores K.F.'s statements about the harm he and the business suffered because of her theft.[2]

Defendant also appears to suggest that K.F.'s losses were insignificant because K.F. did not suspect that his company was "in the midst of hardship, much less crisis." Guideline Submission at 4. The Court should not countenance such victim-blaming. Indeed, Defendant was the bookkeeper of K.F.'s business. She was the one using and monitoring the credit card accounts. She was the one paying their bills. And she was the one who took steps to cover her tracks. As K.F put it, "[s]he misrepresented financial transactions, hid purchases, and outright lied to me and my accountants. I specifically instructed her to cancel the business' American Express card years ago-she assured me she had done so. Instead, she secretly kept it active and used it to fund her own lavish lifestyle, annually charging hundreds of thousands of dollars for her personal expenses." Ex. at 2. Defendant herself concedes that she took "steps to cover up" her embezzlement. Guideline Submission at 2.

Simply put, "Defendant offers no basis from which the Court should second guess [K.F.'s] assessment on his finances and the impact of this crime on [him]." *United States v. Foster*, No. 1:20-CR-178-RDA, 2025 WL 209813, at *2–3 (E.D. Va. Jan. 15, 2025) ("It is clear from his victim impact letter that J.T.'s personal interactions with Defendant altered J.T.'s life circumstances and that a $40,000 loss was not a loss that he could afford. Moreover, Defendant offers no basis from which the Court should second guess J.T.'s assessment on his finances and the impact of this crime on his ability to retire. That J.T. did not suffer a devastating loss does not mean that he did not suffer a substantial hardship.").

The same is true of Defendant's contention regarding COVID-19's potential impact on K.F.'s business. Guideline Submission at 4. Defendant's speculation about the potential impact of COVID-19 on K.F.,'s business does nothing to detract from K.F.'s statements about her harm to his business.[3] And it does nothing to address the impact of Defendant's actions on K.F. In any

---

[1] Defendant frames the victim in this matter as Victim Business 1. *See* Guideline Submission at 3. Defendant ignores the fact that K.F.—the owner of the small business—is the other victim in this case. The enhancement can apply to hardships to businesses and individuals alike.

[2] *United States v. Sponaugle*, 621 F. Supp. 3d 474 (D. Del. 2022), is inapposite. That matter involved a loss of $10,000 per year to each of six partners in a medical practice—each of which was a doctor. *Id.* at 508 ("[N]othing in the record supports a finding that the loss of an average of approximately $60,000 by each partner over a period of six years – equal to an average annual loss of around $10,000 per partner – constituted or caused a substantial financial hardship to any of the doctors."). The facts and circumstances of that case bear no resemblance to those here.

[3] Defendant's authority does not help her. In *United States v. Davis*, No. 15–CR–0247(1) (PJS/SER), 2017 WL 1423178 (D. Minn. Apr. 21, 2017), the court declined to apply the substantial financial hardship enhancement because doing so would violate the *Ex Post Facto*

event, there is no question that Defendant's actions were both the but-for and proximate causes of the financial harm he and the business suffered because of her crimes. *See, e.g.*, *United States v. Skouteris*, 51 F.4th 658, 673 (6th Cir. 2022) ("But-for causation requires that the "substantial financial hardship" could not have occurred without the underlying offense, whereas proximate causation requires the harm to be the foreseeable result of the wrongful act."). Indeed, she stole Defendant's funds for nearly a decade—even before the onset of the COVID-19 pandemic.

The Court should thus conclude that the two-level guideline enhancement under § 2B1.1(b)(2)(A)(iii) applies here and make specific factual findings concerning K.F.'s substantial financial hardship.

### B. A Two-Level Reduction Under 4C1.1 Is Unwarranted.

For similar reasons, the Court should disallow a two-level reduction under U.S.S.G. § 4C1.1.

This Zero Point Offender reduction applies where, among other things, "the defendant did not personally cause substantial financial hardship." U.S.S.G. § 4C1.1(a)(6). Section (b)(3) provides that: "In determining whether the defendant's acts or omissions resulted in "*substantial financial hardship*" to a victim, the court shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to §2B1.1 (Theft, Property Destruction, and Fraud). As the Sixth Circuit recently put it:

> Application Note 4(F) does not describe every type of substantial financial hardship. It merely provides a list of exemplars from which we may extrapolate analogous conduct. For instance, courts in other circuits have found substantial financial hardship in a range of cases where the number of victims or the amount stolen was high. . . . Substantial financial hardship that does not squarely fall into one of the listed examples in Application Note 4(F), if sufficiently analogous, may still render a defendant ineligible for a sentencing reduction under U.S.S.G. § 4C1.1.

*United States v. Hanson*, 124 F.4th 1013, 1017 (6th Cir. 2025). Here, for all the same reasons that "financial hardship" enhancement applies under § 2B1.1(b)(2)(A)(iii), the Court should disallow a two-level reduction under U.S.S.G. § 4C1.1 and make specific factual findings concerning substantial financial hardship.

### C. The Court Should Not Address Mr. Joseph's Sentencing Guidelines At Ms. Joseph's Sentencing.

The Court need not—and should not—address the question of the sentencing guidelines potentially applicable to *Mr. Joseph* in connection with Defendant's sentencing. Mr. Joseph has not yet pleaded guilty. The Court has not accepted the parties' plea agreement, and it has not been entered. No Presentence Investigation Report for Mr. Joseph has been prepared. No sentencing date for Mr. Joseph has been set. And neither Mr. Joseph, nor his lawyer will have any role at Ms. Joseph's sentencing. Simply put, this Court should not be called upon to address or otherwise

---

clause of the constitution and because the Government did not establish that the criminal conduct caused the victim company to go into receivership. *Id.* at *2-3. But there, the Government did not even argue that the Defendant in that case directly caused the harm; it contended that "Davis's criminal behavior *indirectly* caused CAM to fail. The government points out that, after Davis's fraud was discovered, two state agencies stopped funding CAM. That caused CAM to lose millions of dollars in grant money, and the loss of that grant money forced CAM to cease operations." *Id.* at *3 (emphasis in original). The Government does not so contend here.

make findings concerning sentencing guideline factors that could affect Mr. Joseph's interests—prior to his sentencing—at Defendant's sentencing.

### Defendant's § 3553(a) Arguments Miss The Mark

*First*, Defendant overstates Mr. Joseph's culpability and minimizes her own. The fact is that $1.4 million in losses suffered by K.F. could not have happened without Defendant. Defendant worked for Victim Business 1. She managed its finances. She had access to K.F.'s cards and brought them into her home. She concealed the scheme. K.F.'s victim impact statement speaks to Defendant's critical role in the scheme—its genesis and impact. It does not mention Robin Joseph at all. K.F. writes, among other things:

> But all of that hard work was undermined by someone I trusted—Valerie Joseph. For over ten years, she stole from me, my business, and my family, taking in excess of $1.5 million dollars through fraudulent use of company and personal credit cards.

> ****

> Valerie Joseph pretended to be a loyal employee, someone I could trust. She looked me in the eye every day, claiming to have the business's best interests at heart, while all the while she was stealing from me behind my back. She misrepresented financial transactions, hid purchases, and outright lied to me and my accountants. I specifically instructed her to cancel the business' American Express card years ago—she assured me she had done so. Instead, she secretly kept it active and used it to fund her own lavish lifestyle, annually charging hundreds of thousands of dollars for her personal expenses. (see the attached spreadsheet).

Next, though Defendant cherry picks certain information from Robin Joseph's interview concerning his and Defendant's fraudulent use of K.F.'s credit cards, text messages communications between Defendant and Mr. Joseph makes plain that she was the one who controlled the cards and had the final say over how they should be used. Indeed, Robin Joseph would ask Defendant for permission to use the cards and which card he should use. Ex. 1 at 1, 5; Ex. 2 at 1 ("Can I use the Visa to pay electric?$787.52"; Defendant responds "Yes"); Ex. 3 at 1 (asking Defendant "Did you check the CC to see if I could pay on the electric bill?"). Defendant would direct Robin Joseph to use one victim card instead of another. Ex. 4 at 1 ("Use Amex"). Further, when Defendant did permit Robin Joseph to use a victim credit card, she would provide the card to him. Ex. 1 at 8 ("I put CC in the front pocket of your light green shorts that are sitting on the computer desk."). Defendant also rebuffed a request by her husband to use K.F.'s card, noting that, "We need to chill. We put the house on there n I just put this tour on there. Too much for one month." Ex. 1 at 7. Indeed, the very message cited by Defendant in her Guidelines Submission at Ex. D reflects that Defendant is telling Robin Joseph what to purchase using K.F.'s credit card: a necklace for her. Defendant then checks on Robin Joseph to make sure that item she asked her husband to purchase for her was not shipped to Victim Business 1. *Id.*

It makes sense that Defendant controlled her husband's access to K.F.'s cards and the amount she allowed him to spend on them: She was the one who had to use Victim Business 1's funds to pay balances on the cards, and she was the one who had to conceal their use from victim K.F. To be sure, Robin Joseph used K.F.'s credit cards in connection with the scheme and benefited from it. But there is no question that Defendant was the scheme's driving force and is far more culpable than Mr. Joseph.

*Second*, Defendant appears to suggest that her theft was not greedy in nature. Sentencing Mem. at 6. Not so. Of course, Defendant's offense was driven by greed: The funds she stole from the victim in this case allowed her and her family to live a lifestyle that she otherwise could

not afford.  The fact that Defendant did not use the money she stole to shop at luxury boutiques is irrelevant.  No matter how Defendant spent the funds they were not hers to spend.

*Third*, Defendant claims that "gradual nature of the theft" is a mitigator and minimizes the nature of the harm she caused.  *Id.* at 6-7.  This argument fails.  The damage caused to K.F., his elderly father, and the business is plain from K.F.'s victim impact statement.  Indeed, though Defendant appears to claim that she did not "drastically alter" a victim's life because of her conduct, *Id.* at 7, there can be no question that she did.  Defendant does not work and lives in a beach house she and her husband purchased in the name of her son.  Ex. 5; Guideline Submission Ex. A.  Victim K.F., by contrast, is still working—forced, because of Defendant's actions, to postpone his retirement indefinitely and to scale back the funds he can provide to his elderly father, the founder of the business.  VIS at 2.  K.F. still works long hours.  *Id.* at 2.  Defendant does not work at all—making no effort to even begin to pay back the $1.4 million dollars she owes Defendant.  PSR ¶ 59 (Defendant has been unemployed since 2023).[4]

*Fourth*, regarding "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), Defendant points to various "comparators from this District" whom Defendant says, "have been found guilty of similar conduct."  Sentencing Mem. at 10.  But none of the cases pointed to by Defendant are on all fours with the facts and circumstances here, as set forth below:[5]

- In *Blizzard*, as Defendant acknowledges, the defendant there did not plead guilty to Aggravated Identity Theft.  *Id.* at 11.  Further, as the Government understands it, the victim in that case had died, presenting potential litigation challenges,[6] and the defendant there claimed to have certain neurological issues.  *See United States v. Eddy Blizzard*, No. SAG-22-138.

- Likewise, in *Warrior*, the defendant, a money launderer, also did not plead guilty to Aggravated Identity Theft.  Further, the parties agreed to a term of imprisonment of 42 months' and that the final anticipated adjusted offense level was 21.  *United States v. Ambrose Obinna-Warrior*, No. SAG-23-299, Plea Agreement (ECF No. 91) at 5-7.  The loss amount there was $467,912.  *Id.*

- Nor did the defendant in *Richison* plead guilty to Aggravated Identity Theft.  And, although losses the defendant cause were close in amount to those here (over $1.6 million dollars), those losses were spread across numerous victim clients—unlike here.  *United States v. David Richison*, No. GLR-19-0387, Plea Agreement (ECF No. 9).

- In *Pylant*, the victim business was a large Washington D.C.-based trade association and not a small, family-owned business such as Victim Business 1 here.  *United States v. Linda Pylant*, No. RDB-21-176, Plea Agreement (ECF No. 27) at 13.  Further, the defendant there—though involved in a variety of fraud activities—stole

---

[4] The Government understands from Defendant's Pre-trial Services Officer that Defendant has not worked since moving to South Carolina in 2021.  The Government respectfully requests that the PSR be modified to reflect this change.

[5] Further, "[c]ourts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized." *United States v. Friend*, 2 F.4th 369, 382–83 (4th Cir. 2021).

[6] The Government understands the guidelines there were 51 to 63 months (24/CH 1).

more than $900,000 from the victim business, in contrast to the at least $1.4 million Defendant stole from the victim here.

- In *Buford*, the losses were to Medicaid and arose from payments made to the defendant for dentures that he billed for but were never delivered. *United States v. Edward Buford*, No. TDC-20-186, Plea Agreement, Stipulated Facts (ECF No. 141-1) at 3. Further, he did not plead guilty to Aggravated Identity Theft. Both are distinguishing factors from the circumstances here.

*Finally*, though Defendant references the need to pay restitution and has agreed to the Court entering an order of restitution to K.F. in the amount of $1.4 million, Sentencing Mem. at 13-14, Defendant has to date made no effort to pay any amount in restitution or obtain employment so that she can pay it now or in the future. And this is so even though she used her nearly $200,000 inheritance to buy her beach house in South Carolina. Guideline Submission Ex. A at 1 ("JOSEPH had a power of attorney for his son, CODY JOSEPH, to buy [defendant's residence]. The down payment for the house came from his wife's inheritance, which was approximately $176,000."). Moreover, her and her husband's choice to put their beach house in the name of their son—rather than in their own names—following their theft of at least $1.4 million dollars from K.F. speaks for itself.

For all these reasons, and all the reasons set forth in the Government's sentencing submission dated April 10, 2025, the Government requests that the Court sentence Defendant to 41 to 51 months' imprisonment as to Count One and the mandatory 24 months' imprisonment consecutive as to Count Two, to be followed by three years' supervised release.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:    _____/s/_____
       Paul A. Riley
       Assistant United States Attorney

cc:    Maggie Grace, Esq. (by ECF)
       Helen Domico, U.S. Probation Officer (by electronic mail)